**<u>Exhibit A</u>**

<u>AIRCRAFT OPERATING AGREEMENT</u>

THIS AIRCRAFT OPERATING AGREEMENT (this "Agreement") is entered into as of May 25, 2017, by and between ATLAS AIR, INC., a Delaware corporation having its principal office at 2000 Westchester Avenue, Purchase New York 10577, USA ("Atlas"), and YANGTZE RIVER AIRLINES CO. LTD., having its principal office at 12F Building A, Yunding International Plaza, No. 800, Chengshan Road, Pudong, Shanghai 200120, P.R. China. ("Customer").   Atlas and Customer are referred to herein individually as a "Party" and collectively as the "Parties."

WITNESSETH:

WHEREAS, Atlas desires to lease one or more aircraft to Customer, and Customer desires to take on lease such aircraft, all upon the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing, together with the mutually agreed upon terms and conditions contained herein, the Parties agree as follows:

**Article 1**
**Main Principles**

1.1     Atlas shall lease to Customer, and Customer shall take on lease from Atlas the aircraft identified in <u>Annex A</u> hereto (individually and collectively, the "Aircraft"), upon the terms and conditions set forth in this Agreement.

1.2     All flights of the Aircraft conducted pursuant to this Agreement (the "Flights") shall be operated under Atlas prefix and flight numbers and in accordance with the flight schedule specified in <u>Annex A</u> (the "Schedule").  The Schedule may be amended from time to time in accordance with the terms and conditions set forth in Article 7 hereof.

1.3     It shall be a condition precedent to Atlas' obligations under this Agreement that Atlas has obtained all governmental and other consents, approvals and authorizations required to allow Atlas to operate the Flights in accordance with this Agreement.  Atlas agrees to use commercially reasonable efforts to obtain any such required approvals before the first Flight is scheduled to operate under this Agreement and to maintain all required approvals during the Term of this Agreement.  In the event an approval required to operate any Flight in the Schedule is not granted or revoked despite Atlas' commercially reasonable efforts, it shall be deemed a Force Majeure.  It shall be a further condition precedent to execution of this Agreement that HNA Modern Logistics Group and Customer execute and deliver a guaranty agreement in substantially the form of Exhibit A of this Agreement.

1.4     Customer shall not sublease or otherwise obligate Atlas to operate the Aircraft on behalf of third parties without first receiving prior written consent from Atlas in its sole discretion.  Such consent shall be subject to regulatory approval and compliance at the sole cost and expense of Customer.

1.5     Certain capitalized terms used but not defined in the body of this Agreement are defined in <u>Annex A</u> hereto.

## Article 2
## Rates, Charges and Responsibilities

2.1    Customer shall pay Atlas for the services provided by Atlas pursuant to this Agreement at the Block Hour Rate set forth in <u>Annex A</u> (the "Block Hour Rate").  Monthly payments shall be determined by multiplying the Block Hour Rate by the greater of (a) the Monthly Minimum Block Hour Guarantee (as defined in <u>Annex A</u>) and (b) actual Block Hours operated for the applicable month.  The number of Block Hours operated shall be determined by Atlas from the Captain's Flight Log provided that Atlas may make any adjustments it deems necessary in its reasonable discretion based on the Aircraft Communications Addressing and Reporting System ("ACARS") record of aircraft movements or such other documentation Atlas deems relevant.  Atlas' determination with respect to Block Hours shall be regarded as final.  For purposes of this Agreement, the term "Block Hours" shall be calculated from the time of brake release prior to Aircraft taxiing for Flight departure to the time of brake set following arrival, taxiing and termination of the Flight.  In addition, Customer shall operate the Aircraft at a minimum block hour per cycle ratio as set forth in <u>Annex A</u>.  It is understood and agreed that any extra flights not provided for by <u>Annex A</u> (charter or otherwise) requiring an additional aircraft under this Agreement shall not be attributable toward the Monthly Minimum Block Hour Guarantee unless specifically agreed in writing by Atlas.

2.2    Atlas shall be responsible only for provision of the following:

(a)    Aircraft;

(b)    Flight crew, including salaries, pensions, social security and per diems;

(c)    Crew hotel accommodations, airport to hotel and return transfers and crew positioning and depositioning. The cost of Atlas providing crew hotel accommodations, airport to hotel and return transfers and crew positioning and depositioning is included in the Block Hour Rate based upon the Flight Schedule. Such amount shall be subject to change based on schedule changes or changes in hotel or transfer expenses. If additional crew positioning/depositioning is required to perform Flights outside of Customer's regular schedule, such additional positioning/depositioning shall be for the account of Customer and shall be agreed in advance at the time such flights are booked and shall be invoiced accordingly;

(d)    Maintenance of the Aircraft, including line maintenance, towing for maintenance purposes, hangar fees, and local maintenance assistance;

(e)    Aircraft hull and third-party liability insurance as set forth in Article 10; and

(f)    Flight planning and dispatch.

Any and all costs or charges due to third parties for which Atlas is responsible under this Section 2.2 shall, if practicable, be paid by Atlas directly to such third parties, and Atlas hereby indemnifies Customer against any and all such related costs or charges.  In the event Customer is required to pay any such costs or charges directly to third parties, Atlas shall reimburse Customer

for said costs upon receipt by Atlas of satisfactory evidence of payment by Customer of such costs.

2.3     Atlas shall provide or cause to be provided through contractors of its selection, and Customer shall compensate Atlas as set forth in Section 2.5 of Annex A, for the provision of pallets (PMCs only), nets and tension equipment meeting all regulations and standards of the United States Federal Aviation Administration ("FAA") and Joint Aviation Authorities/European Agency for Safety of the Air (JAA/EASA) regulations and standards at the following airports: CGO, ORD and PVG.  Customer may request Atlas to provide or cause to be provided through contractors the abovementioned provisions at additional locations on the Flight Schedule on seven (7) days written notice to Atlas.  Customer shall compensate Atlas as set forth in Section 2.5 of Annex A for the provision of such equipment at locations other than CGO, ORD and PVG.

2.4     Customer shall be responsible for provision of and payment for all other operating expenses, whether by providing necessary goods and services or making payments directly to third-party providers of necessary goods and services, including but not limited to the following:

    (a)     Aircraft fuel (including all in plane fuel costs such as fuel storage, and transportation, if applicable, and fuel related taxes) and into plane fueling services;

    (b)     Navigation fees, including air traffic control fees, en route fees, over flight fees and any broker fees required to arrange requisite services of such type and nature;

    (c)     Landing and/or departure fees, parking fees and airport fees and handling charges;

    (d)     Local crew ground transportation from the Aircraft to airport terminal/customs/immigration, including crew handling through customs, immigration and quarantine;

    (e)     Catering and crew meals as per Atlas' policy (as set forth in Section 2.4 of Annex A);

    (f)     When Customer's rotations are 12 hours or longer, Customer shall provide provisioning of crew bed rest linens for each crew member, including one sheet, pillow, pillowcase and blanket; disposable linens or those similar to Customer's own crew linens are acceptable (as set forth in Section 2.4 of Annex A);

    (g)     Receiving, collecting and distributing all necessary flight operational paperwork to Atlas crew members to dispatch the Aircraft;

    (h)     Aircraft handling (including use of ground power during aircraft ground times for cargo loading and unloading), load planning, cargo loading or unloading, pushback, lavatory cleaning, water and trash removal, cleaning of flight deck (including linen service) and all cargo compartments, deicing and hazardous-material handling, all in accordance with Atlas' ground-handling program;

(i)      Preparation and packaging of cargo, buildup and breakdown of pallets, ramp positioning and de positioning, and all similar cargo handling activities;

(j)      Warehousing, receipt, delivery, ground transport and documentation of cargo traffic at all stations;

(k)      All U.S. and foreign customs fees, fines, penalties, duties and taxes applicable to the Flights and the cargo and mail tendered for carriage thereon, even if imposed retroactively following Flight completion;

(l)      Pallets, nets and tension equipment meeting all regulations and standards of the United States Federal Aviation Administration ("FAA") and Joint Aviation Authorities/European Agency for Safety of the Air (JAA/EASA) regulations and standards at all appropriate airports under this Agreement with the exception of CGO, ORD and PVG;

(m)      Security costs and expenses as further set forth in Section 4.11;

(n)      Cargo and mail insurance as further set forth in Article 10;

(o)      All taxes as further set forth in Article 3 below;

(p)      All costs associated with ground operations training to be provided by Atlas to Customer (if such training is requested by Customer);

(q)      Initial delivery and final redelivery of the Aircraft to O'Hare International Airport in Chicago, Illinois at the beginning and end of the Term of this Agreement; and

(r)      All other operating expenses or unusual charges that may arise from time to time as a result of operations contemplated under this Agreement, except such expenses for the account of Atlas as set forth in Section 2.2 of this Agreement.

Any and all costs or charges due to third parties for which Customer is responsible under this Section 2.4 shall be paid by Customer directly to such third parties, and Customer hereby indemnifies and agrees to hold Atlas free and harmless from and against any and all such related costs, fees, or charges.  In the event payment of any such costs or charges by Atlas to third parties is required or expedient, as determined by Atlas in its sole discretion, Customer indemnifies and agrees to reimburse Atlas for said costs, fees, or charges, plus an administrative fee of two percent (2%) of the aggregate total required to be paid by Atlas.

Upon the request of Atlas, Customer shall obtain a fuel waiver from any fuel vendor used to supply fuel to the Aircraft releasing Atlas from any and all financial responsibility relating to fuel uplifted on the Aircraft by such vendor.

2.5      Invoicing and payments shall be as set forth in Annex A.

**Article 3**
**Taxes**

3.1     Any and all payments due to Atlas hereunder shall be free from, and Customer shall indemnify and hold Atlas free and harmless from, any and all liability for any and all sales and/or use taxes, and all other taxes, including excise taxes and property taxes (including property taxes assessed based on frequency of operations, time in jurisdiction, time on ground, landings or otherwise), duties, fees, withholdings, VAT, or other assessments or charges, including any and all amount(s) of interest and penalties which may be or become due in connection therewith, imposed or withheld by any governmental authority or agency, or other entity which may be or become due arising out of or resulting from the terms and conditions of this Agreement, payments hereunder, and/or the operation of the Aircraft hereunder, except for United States taxes levied on the income of Atlas.

**Article 4**
**Operational Control**

4.1     During the Term, the Aircraft shall be registered under the laws of the United States of America.  Notwithstanding any other provision of this Agreement, the Aircraft shall at all times be under the exclusive possession, direction, and operational control of Atlas, whose Captain and dispatcher shall have complete discretion concerning preparation of the Aircraft for Flight(s), the load carried (as well as distribution thereof), whether a Flight shall be undertaken, the route to be flown, whether landings shall be made, and all other matters relating to or arising out of operation of the Aircraft.  Such decision(s) of the Captain or dispatcher shall be final and binding upon the Parties.

4.2     At all times during the Term, Atlas shall maintain on the Aircraft a valid Certificate of Airworthiness issued by the FAA.

4.3     Atlas shall maintain and operate the Aircraft in accordance with its FAA approved Atlas Operations Manual and Maintenance Program.  Atlas shall endeavor to comply with any additional requirements imposed upon the Aircraft or crew by Customer, or any governmental authority with which Customer must comply, provided it is not in conflict with FAA, United States Department of Transportation ("DOT"), United States Customs and Border Protection or United States Transportation Security Administration ("TSA") regulations and requirements, but any and all additional costs or charges related thereto shall be for Customer's account.

4.4     During the Term, the Aircraft shall meet any and all current requirements of United States federal government regulations, directives and orders.  Atlas shall endeavor to comply with any additional requirements imposed upon the Aircraft or crew by applicable foreign governmental agencies or regulations, provided it is not in conflict with FAA, DOT or TSA regulations; and provided further that any and all additional costs or charges related thereto shall be for Customer's account.

4.5     Any and all flight crew provided by Atlas under this Agreement shall be properly certified in accordance with the rules and regulations of the FAA and International Civil Aviation Organization (ICAO), and shall comply with the laws and requirements of all countries whose rules and regulations may apply under this Agreement which are not in conflict with FAA rules, in accordance with the Flight(s) and/or Schedule(s) set forth in <u>Annex A</u>.

4.6     At all times during the Term, Atlas shall be responsible for all necessary licenses and permits relating to mechanical operation of the Aircraft.

4.7     At no time during the Term shall any crewmember, officer, agent, employee, or servant to be supplied by Atlas hereunder be deemed to be a crewmember, officer, agent, employee, or servant of Customer.   Any independent contractor utilized by Atlas in the performance of its obligations hereunder shall not be under or subject to the direction and control of Customer.

4.8     Nothing contained in this Agreement shall be deemed to obligate Atlas to operate the Aircraft in violation of the terms or conditions of any insurance policy relating to the Aircraft or its operation in contravention of the time regulations applicable to the crew to be provided hereunder or in violation of any other law, rule or regulation controlling Atlas' operations under this Agreement.

4.9     Atlas may substitute any freighter aircraft listed in the Atlas Air Operations Specifications for operation of the Flight(s) contemplated hereunder, and Atlas may use such substitute aircraft for the operation of additional flight(s) within the authorized operating areas listed in the Atlas Air Operations Specifications, provided that any such substitute aircraft used shall meet all governmental and regulatory requirements as set forth herein.

4.10     Atlas shall have the right in its sole discretion to utilize the Aircraft for its own purposes during periods of Customer's scheduled or unscheduled downtimes, provided such use does not interfere with Customer's scheduled operations under this Agreement and does not increase Customer's cost.  Any such use by Atlas shall be without compensation, credit or offset to Customer, and shall not reduce or affect the Monthly Minimum Block Hour Guarantee hereunder.  If such use of the Aircraft by Atlas extends beyond Customer's scheduled or unscheduled downtimes, resulting in the cancellation of a regularly scheduled Customer Flight, Customer will receive a credit against its Monthly Minimum Block Hour Guarantee obligations in the amount of the cancelled hours.

4.11     Security Provisions.

(a)     Customer shall at its expense adhere to Atlas' security procedures, including but not limited to security procedures relating to the crew, aircraft and cargo, a copy of which will be provided to Customer upon request and pursuant to an appropriate confidentiality undertaking.  Atlas' security procedures may be updated by written notice to Customer from time to time.

(b)     Customer shall perform and comply with all TSA security requirements, including those set forth in the Full All-Cargo Aircraft Operator Standard Security Program ("FACAOSSP") and Customs and Border Patrol/CTPAT Requirements.   This includes but is not limited to the following: i) screening of cargo destined for or outbound from the United States pursuant to the TSA FACAOSSP; ii) screening of service personnel requiring access to the flight deck on Flights destined for or departing from the United States; iii)  screening of all individuals (except Atlas flight crew) to be transported on the Aircraft; iv) providing security according to TSA requirements for the Aircraft

while on the ground; v) providing secure transportation for Atlas crews when required; vi) compliance with host country security requirements; vii) providing security for cargo at build-up and consolidation sites; viii) limiting access to the facilities where cargo is being stored, built-up or consolidated by Customer or its authorized representative to personnel authorized by the local airport authority; ix) ensuring that all individuals with access to cargo facilities in the United States are authorized by the local airport to enter the Secure Identification Display Area ("SIDA") or have completed a Security Threat Assessment through the TSA;  x) maintaining a TSA approved cargo screening log pursuant to the FACAOSSP or the Indirect Air Carrier  Standard Security Program; xi) requiring all domestic indirect air carriers and internationally regulated freight forwarders and consolidators to provide certification that all cargo provided by them has been either screened, banded, or is otherwise exempt and maintaining such records for thirty (30) days; xii)  refusing cargo in the United States from a non-regulated freight forwarder; and, xiii) refusing cargo from and international freight forwarder unless they are regulated under a national security program or are IATA certified pursuant to Annex 17.

(c)     Customer shall ensure that individuals at non-U.S. locations with access to cargo being placed on the Aircraft (x) have a background investigation successfully completed in accordance with the requirements of the local airport authority and (y) be given authorized access to the air Operations Area by the local airport authority. Customer shall provide Atlas with a copy of all TSA approved National Cargo Security and Upstream Screening amendments for cargo intended for transportation to the United States, if Atlas designated warehouses are not being utilized at Upstream and LPD locations.

(d)     Unless otherwise agreed by Atlas, Customer shall use security vendors and contractors as designated or approved by Atlas for the operations contemplated by this Agreement.  Atlas shall have the right to inspect and audit Customer's security program (including services provided by any approved vendor or contractor) and Customer agrees to cooperate in any such inspection or audit, provided such inspection or audit shall be conducted at reasonable times and shall not cause an unreasonable disruption to Customer's operation.  Customer shall procure that individuals with access to cargo being placed on the Aircraft have a background investigation successfully completed in accordance with the local airport authority  requirements and be given authorized access to the air Operations Area by the local airport authority.

(e)     Atlas shall not be obliged to operate to any country or airport requested by Customer if such operations would be contrary to Atlas Security operating procedures or directives or to regulations or directives of any governmental entity, including but not limited to the FAA, DOT and the United States Department of Treasury.  Atlas will use reasonable efforts to keep Customer advised in advance of country-related and airport-related operating restrictions of the above types at locations to and from which Flights are to be operated.  Subject to the other provisions of this Agreement governing use, availability and assignment of Aircraft, Atlas will not unreasonably withhold approval of Customer requests to operate to countries and airports not covered by the above types of restrictions.  At the specific request of Customer, Atlas will provide information with

respect to countries, cities and/or airports with restricted over flight, landing and other special requirements.

4.12     Atlas shall have the right, at its sole cost and expense, to inspect and audit Customer or Customer's third party service providers provided that Atlas provides Customer with reasonable advance written notice of its intent to audit or inspect.  Customer agrees to cooperate in any such permitted inspection or audit, provided such inspection or audit shall be conducted at reasonable times and shall not cause an unreasonable disruption to Customer or its vendors operation.

## Article 5
## Cargo Load, Documentation and HazMat

5.1     Customer shall, in accordance with International Airline Standards (IATA) and/or ICAO standards, properly prepare and pack the cargo to be carried, together with all documentation applicable thereto.

5.2     Customer shall be responsible for the issuance, completion, and delivery of air waybills in accordance with Customer's standards and under Customer's name and prefix, as well as any additional documentation necessary for the carriage of cargo.  In the event a special cargo shipment must be accompanied by an attendant, Customer shall comply with all applicable laws and Atlas' policies including completing a jumpseat request which will be provided by Atlas at least 48 business hours in advance (72 hours for first time flyers) and receive a signed FAA form 8430 prior to operating.

5.3     The carriage of cargo attendants on a Flight hereunder shall comply with the appropriate provisions of the Federal Aviation Regulations and TSA requirements.

5.4     Customer shall assure that cargo of a dangerous, hazardous, or offensive nature ("HazMat") be packed in accordance with all applicable IATA and ICAO regulations, FAA regulations, and regulations of any other governmental authority having jurisdiction over the Aircraft or its operations hereunder, and be accompanied by a duly executed "shippers declaration for dangerous goods."  Carriage of goods which are of a military nature, destined for military use, or subject to governmental transportation restrictions, are subject to prior written approval by Atlas in its sole discretion.  In the event that any applicable regulations relating to carriage of hazardous cargo change, Customer shall change its packaging and/or handling requirements so as to ensure full compliance with such changed regulations.

5.5     Customer warrants that the cargo to be transported by Atlas pursuant to this Agreement shall not contain any contraband, materials, products, or other substances the importation, possession, transportation, or distribution of which would constitute a violation of any law of the United States or any other governmental authority having jurisdiction over the Aircraft or operations hereunder.  Customer agrees to indemnify and hold Atlas harmless from all costs, expenses (including attorneys' fees), losses, liabilities, damages, fines, and judgments (including attorneys' fees) incurred by Atlas as a result of any breach of the terms and conditions set forth herein.

5.6     General.   Atlas is authorized by the FAA to accept, handle, and carry materials regulated as dangerous goods (hazardous materials), including hazardous COMAT (Customer hazmat material), in accordance with 49 C.F.R. Parts 171 through 180 and 14 C.F.R. Part 121, Subpart Z and Appendix O.   Subject to compliance with the above provisions and applicable rules, regulations and requirements of ICAO, the FAA and relevant foreign regulatory agencies, Customer shall have the right to tender to Atlas, and Atlas shall have the obligation to transport dangerous goods on the Aircraft.

5.7     Policy, Procedure and Authority.   Dangerous Goods must be accepted, carried and handled in accordance with the process described in the Hazardous Material Program, contained in Atlas' FAA-approved Weight and Balance Manual.   The Atlas-designated Dangerous Goods Manager shall be the person responsible to maintain and update the dangerous goods program and enforce compliance.   Contact information is as follows:

> Jaime Escobar – Dangerous Goods Manager
> E-mail:        jescobar@atlasair.com
> Telephone:    +1.786.265.2191
>
> Group Contact
> E-mail:        dangerousgoodsauthority@atlasair.com
> Telephone:    +1.786.265.5990

Customer shall designate and provide Atlas with contact information of a person or persons responsible for Customer's dangerous goods program.   Either party may update its contact information on written notice.

5.8     Training Requirements.   Atlas shall ensure that staff contracted to perform dangerous goods functions are trained in accordance with the Atlas' FAA-approved as described on the operators Weight and Balance Manual.

5.9     Training Records

(a)     Atlas shall maintain records of dangerous goods training for Atlas employees, authorized representatives and vendor personnel.   Training records (initial and recurrent) must be maintained for all training received within the preceding three (3) years for all persons performing or directly supervising dangerous goods job functions, and ninety (90) days thereafter. Atlas' contracted ground service companies, contracted airlines or vendors shall be required to maintain training records for all their personnel involved in the acceptance, packaging and shipping, storage, handling and loading/unloading of dangerous goods for Atlas. The Atlas Ground Operations Training Administrator or if not available, the Manager of Ground Operations Training, shall be responsible for maintenance of training records.   Customer shall provide Atlas with any records from parties contracted directly by Customer to meet applicable training requirements.

(b)     Training that does not satisfy applicable requirements shall not be accepted until validated by the Atlas Air Training department and supplemented with in-house training, if

applicable.  Detailed information and instructions regarding training records and record keeping procedures may be found in the FAA-approved Weight and Balance Manual.

5.10    <u>Hazardous Materials Emergency Response</u>.    To facilitate a properly coordinated emergency response should such response be necessary, Customer or its designee shall immediately inform Atlas about any dangerous goods problem or event in the ramp area relevant to operations under this Agreement.  This shall include, but not be limited to events occurring before or after hazardous materials have been transported on the Aircraft.  ANY INCIDENT/ACCIDENT INVOLVING DANGEROUS GOODS MUST BE REPORTED IMMEDIATELY TO ATLAS HEADQUARTERS BY CALLING +1.914-701-8050. Additionally, a copy of the Notification of the Pilot in Command must be made available for immediate distribution to local fire and emergency departments.

5.11    <u>Additional Notification Requirements</u>.

(a)    Customer shall inform Atlas of any incident/accident relevant to an operation for which a report is filed with the FAA pursuant to 49 C.F.R. §§171.15 and 171.16.

(b) Incidents/accidents shall also be reported to the relevant regulatory agencies of State of the operator (in the case of Atlas, the FAA and the U.S. Department of Transportation) and the State in which they occur, including when undeclared or misdeclared dangerous goods are discovered in cargo.

(c)    For all relevant flights under this Agreement, Customer shall send Atlas the Notification to the Pilot in Command form/information by email to Notoc@atlasair.com or by fax to +1.786.265.7025.

(d) Customer shall inform Atlas of any loads of dry ice exceeding 3,000 kilograms.

5.12    <u>CAAC-Specific Requirements</u>.    Customers intending to transport dangerous goods shall obtain approval from the applicable Civil Aviation Authority of China ("CAAC") regional civil aviation administrator and make such approval available to Atlas.  Prior to transporting dangerous goods, Atlas shall ensure that the approval specifically permits use of wet lease aircraft to transport Customer'S dangerous goods.  Transport of dangerous goods must be in full accordance with the requirements of CCAR-276.

5.13    <u>Specific Responsibilities</u>. As per this Agreement, Atlas is responsible for the Aircraft, flight crew, maintenance, and insurance.  Specifically, Atlas is responsible for the training of the flight crew and Aircraft maintenance, the weight and balance procedure and the operational control of the Aircraft.  All other aspects applicable to the dangerous goods regulation, including but not limited to, the acceptance, handling and loading of dangerous goods, incident and accident reporting and follow up are the responsibility of Customer and must be done in full compliance with the ICAO Technical Instructions, the IATA Dangerous Goods Regulations and any additional requirements set forth by CCAR 276.

**Article 6**
**Operational Notifications**

6.1     At the beginning of each weekly rotation, Atlas shall place the Aircraft, suitable for loading of pallets, containers and/or bulk cargo, at the disposal of Customer three (3) hours prior to the scheduled departure time of each Flight, and Customer shall arrange for the Aircraft to be unloaded within two (2) hours after actual arrival (on blocks) of each Flight.

6.2     Atlas shall advise Customer of any expected delays as soon as reasonably possible prior to the scheduled departure time of a Flight.

6.3     Customer shall advise Atlas of any expected delays and/or regarding the expected traffic and weight for Flight(s) as soon as possible, but not less than twenty-four (24) hours prior to the scheduled departure time of a Flight.  If Customer informs Atlas within twenty-four (24) hours prior to the scheduled departure of delays and/or regarding the expected traffic and weight for a Flight, Atlas will use reasonable efforts to accommodate such requests.

6.4     Customer shall inform Atlas at least twenty-four (24) hours prior to the scheduled departure time of a Flight of any special cargo expected for such Flight, such as livestock, HazMat, oversized pieces, and/or other special cargo.

6.5     Customer shall be responsible for transmittal of all air automated manifest system "AAMS" data to U.S. Customs and other similar requirements outside of the United States as required.

6.6     All notices and other messages relating to Flights performed or to be performed under this Agreement shall be sent to Atlas at such departments and addresses noted in Annex A.

6.7     In the event of any operational incident or accident, Atlas shall forthwith inform Customer's Operations Control Center at the address(es) noted in Annex A.  Customer shall be allowed to have an observer present during any and all investigation(s) with respect to any such incident or accident, in accordance with the rules and regulations of the appropriate authorities.  Customer shall consult with Atlas prior to the release of any information to the public or press regarding any such incident or accident.

**Article 7**
**Changes in Flight(s)**

7.1     Customer may request that Atlas accept non-material changes to the Schedule from time to time upon reasonable prior notice and Atlas will accommodate such requests when commercially and operationally practicable; provided, that, Customer shall be responsible for all incremental costs resulting from such schedule changes.  Each Flight change which Atlas accepts that is not notified to Atlas at least 15 days prior to the start of each monthly period will be charged at the greater of (a) the actual cost to Atlas of each such change and (b) USD ▮▮▮▮

7.2     In the event that Customer requests a change to the Flight Schedule that relates to or results in (a) a change in routes served under this Agreement, (b) a change in the number of, or work scheduling of, crew necessary to accommodate such request, (c) a permanent change in arrival or departure times or (d) any material increase in cost to Atlas (a "Material Schedule Change"), such request shall be subject to negotiation of the financial and operational

terms and shall not be implemented unless the Parties agree in writing to the new terms and an appropriate time for implementation.  Material Schedule Change requests shall be submitted by Customer at least thirty (30) days in advance of the month in which any proposed schedule change is to take effect.  Atlas will have no obligation to implement Material Schedule Changes.

7.3     All changes to the Schedule, of whatever nature, are subject to full compliance and, where applicable, prior approval of the relevant Governmental Authorities, including without limitation, having or obtaining all requisite permits, traffic rights, operating authorities and franchises, and any other authorizations required, necessary or desirable under the laws of any Governmental Authority in order to operate Flights for the proposed schedule change.  Any request for a schedule change shall be sent in writing by Customer and Atlas shall acknowledge receipt as soon as practicable thereafter.   Any waiver or waivers by Atlas of any of the requirements or preconditions for a schedule change hereunder shall not constitute grounds for any future waiver of such requirements or preconditions. Prior to cancelling any Flight, Customer shall be required to consult with Atlas.

7.4     Should any intermediate landing become necessary due to causes beyond the reasonable control of Atlas (such as, but not limited to, adverse weather conditions, air traffic control, Customer payload requirements in excess of normal payloads, and/or Force Majeure), any and all additional costs (including added Block Hours and landing fees) incurred with respect thereto shall be borne by Customer.   Additional costs with respect to unscheduled intermediate landings or Aircraft return after takeoff caused solely by mechanical problems are for the account of Atlas, in which case Customer shall pay only the Block Hour and fuel charges as if the Flight had been non-stop and according to its original schedule, and Atlas shall pay the added landing fees.  No payment shall be due from Customer to Atlas with respect to Aircraft returning to ramp before takeoff caused solely by mechanical problems.

**Article 8**
**Non-Availability of the Aircraft**

8.1     Should it become apparent, regardless of the cause, that the Aircraft will not be available in time to perform a Flight under this Agreement, the Parties hereto shall, in mutual consultation, endeavor to minimize the effects of such non-availability, including reasonable efforts to arrange for substitute aircraft.  Any such substitute aircraft shall be considered an "Aircraft" for all purposes of this Agreement for the period that such substitute aircraft operates Flights hereunder.

8.2     Any substitute aircraft provided by Atlas for the performance of Flights hereunder shall comply with all pertinent FAA and other regulatory requirements set forth in this Agreement.

8.3     When a substitute aircraft is used for any Flight, fuel readings shall be taken at the commencement and termination of such Flight(s), and Customer shall reimburse Atlas for the cost of any fuel used on such Flight(s).

**Article 9**
**Liability and Indemnity**

9.1      Subject to the other provisions of this Article 9, Atlas shall assume liability for, and indemnify and hold Customer, its employees, officers, agents, and subcontractors free and harmless from, any and all claims, causes of action, liabilities, costs and other charges and expenses (including reasonable attorneys' fees) arising out of:

(a)      Loss of or damage to the Aircraft during the Term when the Aircraft is on lease to Customer hereunder;

(b)      Death of or injury to crew members provided by Atlas, and any individual(s) carried on the aircraft at Atlas' discretion, or other personnel of Atlas or provided for by Atlas while acting in connection with the performance of this Agreement; or

(c)      Death of or injury to persons, and loss of or damage to property, other than cargo carried hereunder, caused by the Aircraft during the performance of this Agreement or any part thereof;

unless such loss, damage, death, or injury is caused by the willful misconduct or gross negligence of Customer or its employees, officers, agents, or subcontractors.

9.2      Atlas, its employees, officers, agents, and subcontractors shall not be liable for, and Customer shall indemnify, defend and hold Atlas, its employees, officers, agents, and subcontractors free and harmless from any and all claims, causes of action, liabilities, costs and other charges and expenses (including reasonable attorneys' fees) arising out of:

(a)      Loss, delay, non-delivery, damage to, or any other claims relating to cargo, property, or mail carried or to be carried on the Flight(s) under this Agreement, including but not limited to any claims arising from carriage of any cargo of a dangerous, hazardous or offensive nature;

(b)      Death of or injury to personnel of Customer, its agents, and/or subcontractors while acting in connection with or performance of this Agreement;

(c)      any noncompliance with or breach of any provision of this Agreement by Customer;

(d)      any loss of or damage to the Aircraft caused by Customer, its agents or subcontractors, including but not limited to, damages to parts, equipment, and attachments installed thereon, resulting from fueling, loading, unloading, or other ground handling by Customer, its agents or subcontractors; or

(e)      death of or injury to persons, including third parties, and loss of or damage to property, including that of third parties, caused by Customer,  or any of its agents or contractors during the Term;

unless such loss, damage, death, or injury is caused by the willful misconduct or gross negligence of Atlas, its employees, officers, agents or subcontractors.

9.3      Any and all cargo claims that are filed by shippers and/or consignees shall be handled by Customer.

9.4      Notwithstanding anything in this Agreement to the contrary, neither Party shall be liable to the other Party for compensation for loss of use of the Aircraft or any other special, incidental, consequential or punitive damages in connection with any claim under or arising out of this Agreement (except as may be required in respect of indemnification for third party claims).

9.5      The provisions of this Article 9 shall survive the termination of this Agreement.

## Article 10
## Insurance

10.1      During the Term, Atlas shall procure insurance covering Aircraft hull & spares "all risks," comprehensive aviation legal liability, including hull & liability war risks coverages to the extent such coverage is available on commercially reasonable terms in the marketplace.  Comprehensive aviation legal liability coverage shall be for a combined single limit of not less than One Billion Dollars (USD $1,000,000,000) for any one occurrence, but in the aggregate with respect to products liability insurance.

10.2      Customer shall, at its own cost and expense, procure cargo and mail insurance in amounts reasonably satisfactory to Atlas to cover all risk of loss of cargo and mail tendered hereunder, but in no event less than Fifty Million Dollars (USD $50,000,000) for any one occurrence.  Customer shall also be solely responsible for processing and settlement of any and all claims relating to lost, delayed, undelivered or damaged cargo or mail.  Customer shall also procure aviation liability insurance to cover its other potential obligations under Article 9 of this Agreement.

10.3      Customer shall be responsible for any additional war risks premium surcharges or other charges applicable as a result of operations to, through or over any geographical areas that are not covered under Atlas' standard insurance policies.

10.4      The insurance carried by each Party shall be primary and non-contributory.

10.5      Each Party shall arrange for its insurers to waive any rights of recourse including subrogation against the other Party, its employees, officers, agents, or subcontractors in accordance with any liability assumed hereunder.  Notwithstanding the foregoing, Atlas will not be obligated to cause its war risk insurers to waive rights of subrogation.

10.6      Each Party, with respect to its own responsibilities hereunder, shall designate the other Party an additional insured in its policies covering liability risks respectively assumed hereunder, and shall have inserted in those policies an appropriate severability of interest and cross liability clauses provided, that, Atlas will not be required to name Customer as additional insured under war risk coverages.

10.7      Each Party shall arrange that the policy territory of such Insurances shall be worldwide, subject to such territorial exclusions as may be usual and customary in the worldwide

airline insurance industry.  Insurances arranged must always cover the geographical territories that the Aircraft will be flown in and operated on the ground.

10.8     Each Party shall procure that the interest of the other Party in such Insurances shall be insured regardless of any breach or failure or violation by the Insured of any warranties, declarations or conditions contained in such policies.

10.9     Prior to commencement of operations hereunder and reasonably in advance of any expiration of each policy of insurance required pursuant to this Agreement, each Party shall deliver to the other Party certificates evidencing the insurance referred to herein; and

10.10    Each Party shall ensure that such certificate includes a provision giving the other Party not less than thirty (30) days advance notice (ten (10) days advance notice in the event of cancellation due to non-payment) of intent to cancel or materially alter the insurance (in a manner adverse to the other party) carried as required by this Agreement, and not less than seven (7) days advance notice (or such shorter period as may be customary) in respect of war and allied perils coverage changes.

## Article 11
## Force Majeure

11.1     Any event or occurrence beyond the reasonable control of either Party, including but not limited to national emergency, terrorism, acts of God, war, civil war or disobedience, labor strikes, work stoppage, fire, floods, explosions, earthquakes, epidemics, quarantine restrictions, other natural disasters, embargoes, seizure, condemnation, mechanical failure or grounding of the Aircraft by its manufacturer, the use of the Aircraft becoming prohibited by any applicable law, failure of usual sources of supply, services or modes of transportation or actions of any government authority (including a call up of the Aircraft by U.S. authorities under the Civil Reserve Air Fleet ("CRAF") or related government program, or for Air Mobility Command or CRAF flights) that affects such Party's ability to perform under this Agreement shall be considered a force majeure hereunder ("Force Majeure").

11.2     Any Party affected by a Force Majeure event shall give notice of such event or occurrence to the other Party.  Upon giving such notice, during the period of a Force Majeure event, all obligations of the Parties hereunder affected by such Force Majeure event shall be suspended until such event is no longer applicable, except for payment of all outstanding invoices.

## Article 12
## Governmental Actions

12.1     Customer acknowledges that the terms of this Agreement are based in part upon existing governmental regulations, whether by the United States of America or foreign governmental authority(ies) or entity(ies).  In the event of governmental changes to such flight regulations, including, but not limited to time and duty rules, security regulations, operational and maintenance regulations applicable to air carriers similarly regulated as Atlas or to the types of aircraft operated by Atlas, which have a significant adverse financial impact upon Atlas, the Parties agree that Customer and Atlas shall consult as to methods by which to ameliorate the

adverse financial impact of said cost increases. If the Parties are unable to agree upon an allocation of such financial impact within sixty (60) days after Atlas has provided Customer with notice of such impact, Atlas may terminate this Agreement upon thirty (30) days' advance written notice to Customer.

## Article 13
## Authorizations

13.1     The Parties agree that each of them, in accordance with their respective responsibilities hereunder, shall timely apply for and obtain all necessary governmental approvals, traffic rights, airport clearances, and other permission (if any shall be required) with regard to the Flights.

## Article 14
## Termination.

14.1     This Agreement may be terminated as provided in Annex A.

14.2     This Agreement shall terminate automatically if a Party is declared bankrupt, or becomes insolvent, or files a petition for bankruptcy, or if the whole or a substantial part of the other Party's property is seized before judgment or under an execution, or if a bankruptcy or insolvency proceeding is commenced against the other Party in any jurisdiction.

14.3     Except as otherwise provided herein, termination of this Agreement by either Party shall be without prejudice to other Party's rights and liabilities hereunder and at law.

## Article 15
## Applicable Law and Jurisdiction; Currency Indemnity

15.1     This Agreement and the interpretation and performance hereof shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws other than Section 5-1401 and 5-1402 of the New York General Obligations Law.

15.2     Each Party hereby irrevocably agrees, accepts and submits to, for itself and in respect of any of its property, generally and unconditionally, the exclusive jurisdiction of the courts of the State of New York in the City and County of New York and of the United States for the Southern District of New York, in connection with any legal action, suit or proceeding with respect to any matter relating to or arising out of or in connection with this Agreement or any other operative agreement and fully waives any objection to the venue of such courts; provided that Customer notwithstanding the foregoing agrees that any legal action or proceeding arising out of or in connection with this Agreement may be brought by Atlas in any jurisdiction where Customer or any of its assets may be found. To the fullest extent permitted by applicable law, each Party hereby waives, and agrees not to assert, by claim of motion, as a defense, or otherwise, in any such suit action or proceeding any claim that it is not personally subject to the jurisdiction of the above named New York courts, that the suit, action or proceeding is brought in an inconvenient forum, or that the venue of the suit, action or proceeding is improper.

15.3     Customer hereby irrevocably designates, appoints and empowers Yangtze River Express Airlines Co. Ltd. with an address of 10700 Seymour Avenue, Franklin Park, IL,

60176 as its authorized agent for service of process in any suit or proceeding with respect to this Agreement.

15.4     Customer agrees that a final judgment in any action or proceeding arising out of or relating to this Agreement shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of the indebtedness or liability therein described, or in any other manner provided by applicable law.

15.5     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement.

15.6     To the extent that Customer may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), Customer hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the full extent permitted by the law of such jurisdiction.  Neither Customer nor any of its property, assets or revenues shall enjoy any right of immunity, sovereign or otherwise, or exemption under applicable laws on any grounds from suit, seizure, execution, attachment or other legal process in respect of its obligations hereunder, and the execution, delivery and performance of such obligations shall constitute its private and commercial acts.

15.7     All amounts payable hereunder shall be paid in United States dollars.  Given that payments shall be made in USD, the remainder of this clause has no applicability except in a default scenario. If any sum due from Customer under this Agreement or under any order or judgment given or made in relation thereto has to be converted from the currency ("the first currency") in which the same is payable under this Agreement or under such order or judgment into another currency ("the second currency") for the purpose of (a) making or filing a claim or proof against Customer, (b) obtaining an order or judgment in any court or other tribunal or (c) enforcing any order or judgment given or made in relation to this Agreement, Customer shall indemnify and hold harmless Atlas from and against any loss suffered as a result of any difference between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and (ii) the rate or rates of exchange at which Atlas may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  Any amount due from Customer under this Section 15.7 shall be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Agreement and the term "rate of exchange" includes any premium and costs of exchange payable in connection with the purchase of the first currency with the second currency.

### Article 16
### Additional Customer Obligations

16.1     Customer acknowledges that U.S. government agencies, including the United States Department of the Treasury Office of Foreign Assets Control ("OFAC"), the United States

Department of Commerce Bureau of Industry and Security and the United States Department of State Directorate of Defense Trade Controls, place limitations on certain types of exports to, and other transactions with, named governments, entities and individuals.  Customer warrants that it will conduct its business pursuant to this Agreement in a manner that does not cause Atlas to violate any such requirements.  In particular, without limiting the applicability of the above, Customer represents that it will not cause goods to be exported on Atlas' services to, cause goods to be imported on Atlas' services from, or in using Atlas' services otherwise engage in financial transactions with, persons on OFAC's Specially Designated Nationals and Blocked Persons List.  Customer agrees to indemnify and hold harmless Atlas, and its employees, officers, agents and subcontractors from all costs, expenses (including reasonable attorneys fees), losses, liabilities, damages, fines, and judgments incurred by Atlas as a result of any violation of the abovementioned requirements.

16.2    Customer shall perform its obligations under this Agreement and conduct all related activities in accordance with the applicable laws of each governmental authority exercising jurisdiction of the Flights performed hereunder and  shall neither undertake, nor cause, nor permit to be undertaken, any activity which either is illegal under any applicable law or would have the effect of causing Atlas to be in violation of any applicable law, including without limitation the U.S. Foreign Corrupt Practices Act.  As required under the U.S. Foreign Corrupt Practices Act, Customer shall not, directly or indirectly, give, offer, promote, authorize or allow to be given, offered or promised, money, gifts or anything of value to a Government Official (defined below), or to any other person(s) or party(ies), while knowing or having reason to know that such thing of value is to be given, offered or promised to a Government Official, in order to (i) improperly influence any official act or decision of such Government Official, or (ii) improperly induce such Government Official to use his influence to affect or influence any act or decision of any governmental authority (including the government of Customer, any department, agency or instrumentality thereof, or any entity owned in whole or in part or controlled by such government), for the purpose of assisting Atlas in obtaining or retaining business, in directing business to any person, or in securing any improper advantage.  For the purpose of this section, the term "Government Official" means any official, employee or representative of a national, state, regional or local governmental body, department, agency or any instrumentality thereof (including without limitation the government of Customer, or any subdivision or branch thereof), any entity owned wholly or in part or controlled by any such entity (including without limitation entities engaged in commercial activity), any political party or political party official, any candidate for political office, and any official, employee or representative of a public international organization (such as the World Bank, International Monetary Fund, or United Nations).

16.3    Customer represents and warrants that no payment, promise to pay, authorization, offer or gift of the sort described in this Article 16 has been made in connection with the promotion of the business interests of Atlas.

16.4    Customer shall require any subcontractors or other person or entities that provide services to Customer in connection with this Agreement to agree to and abide by the representations, warranties and covenants in this Article 16.

16.5     Customer shall maintain true, accurate and complete books and records with respect to all payments made to third parties pursuant to this Agreement or in furtherance of the services provided hereunder.  Should Atlas learn of information suggesting that Customer may have failed to comply with any provision of this section, Atlas or its designee shall have the right, at any time during the term of this Agreement and for a period of three (3) years thereafter, to audit Customer's financial and other books and records relating to its performance under this Agreement.

16.6     Customer shall promptly notify Atlas of (a) the occurrence of any fact or event that would render any representation, warranty, covenant or undertaking in this Article 16 incorrect or misleading, (b) any notice, subpoena, demand or other communication (whether oral or written) from any governmental authority regarding Customer's actual, alleged, possible or potential violation of, or failure to comply with, any laws or regulations governing bribery, money laundering, or other corrupt payments, and (c) any governmental investigation, audit, suit or proceeding (whether civil, criminal or administrative) regarding Customer's violation of, or failure to comply with, any such laws or regulations.

16.7     Notwithstanding anything to the contrary in this Agreement, Atlas may, in addition to its other remedies, immediately terminate this Agreement in the event Atlas should receive information which it reasonably determines to be evidence of a breach by Customer of any representation, warranty, or covenant set forth in this Article 16.  In the event of such termination, Customer shall defend and indemnify Atlas for any third-party loss, cost, claim, or damage resulting from the breach of this Article 16 and Atlas' termination of this Agreement.

## Article 17
### Assignment

17.1     This Agreement will inure to the benefit of and be binding upon each of the Parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor the rights or obligations of either Party may be assigned, subleased, delegated or transferred, in whole or in part, without the prior written consent of the other Party, except that Atlas may assign, transfer or delegate this Agreement to an affiliate.

## Article 18
### Aircraft Maintenance Schedule

18.1     The Parties agree that the Aircraft will not be available for service and shall be scheduled for ground time each week at a suitable airport for the accomplishment of routine line maintenance.  To that end, Customer shall provide a minimum of one twelve-hour period for B747-400F operations during each weekly core schedule for performance of such routine line maintenance.  In addition, the Parties agree that the Aircraft will not be available for service and shall be scheduled and positioned for ground time at Customer's expense at a location where Atlas can itself perform or have performed by a third party "A" checks at necessary or scheduled intervals.  Atlas shall provide notice to Customer of scheduled "A" checks 30 days in advance. If Atlas fails to provide such notice, resulting in the cancellation of a regularly scheduled Customer Flight, Customer will receive a credit against its Monthly Minimum Block Hour Guarantee obligations in the amount of the cancelled hours.  Subject to availability and provided Customer and Atlas mutually agree to cover "A" checks with a substitute aircraft, if the

substitute aircraft must be positioned/depositioned to operate Customer's schedule, Customer agrees to pay the agreed Block Hour Rate per block hour plus expenses relating to the positioning/depositioning of the substitute aircraft.

18.2     The Aircraft must also undergo "C" and "D" checks under Atlas' Maintenance Program.  During such "C" and "D" checks, Atlas will provide an available substitute aircraft from its fleet in order to support Customer's operations.  In the event that Customer operates a B747-400 under this Agreement, Atlas will make reasonable efforts to supply a substitute B747-400.  However, Atlas shall be under no obligation to provide a B747-400 substitute aircraft and Customer acknowledges and agrees that a B747-400BCF may be provided.

**Article 19**
**Miscellaneous**

19.1     The following rules of construction shall apply to this Agreement:

(a)     All uses of "include," "including" or words or phrases of similar import shall be deemed to be followed by "without limitation."

(b)     The headings and titles herein are for convenience only and shall have no significance in the interpretation hereof.

(c)     Unless otherwise provided, all references in this Agreement to "Articles" and "Sections" are to articles and sections of this Agreement; and all references to "Exhibits", "Schedules" or "Annexes" are to exhibits, schedules or annexes attached to this Agreement, each of which is incorporated in this Agreement by reference and made a part of this Agreement for all purposes.

(d)     Unless the context otherwise requires, the words "this Agreement," "hereof," "hereunder," "herein," "hereby" or words or phrases of similar import shall refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof.

(e)     Terms defined in the singular shall have the corresponding meaning when used in the plural and vice versa.  Any definition of one part of speech of a word, such as definition of the noun form of that word, shall have a comparable or corresponding meaning when used as a different part of speech, such as the verb form of that word.

(f)     Unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented and otherwise modified from time to time, and references to parties to agreements shall be deemed to include the permitted successors and assigns of such parties.

19.2     If any term or condition of this Agreement is held to be invalid or unenforceable, the remaining terms and conditions of this Agreement shall not be affected thereby and shall be deemed valid and enforceable to the fullest extent permitted by law.

19.3     A waiver of any default hereunder shall not be deemed a waiver of any other or subsequent default hereunder.  Any failure by either Party to enforce any of its rights hereunder shall not be deemed a waiver of such rights, except in the case of a written waiver by such Party in respect of such rights.

19.4     Each Party has had an opportunity to review this Agreement, with benefit of legal counsel of its own choosing, and no adverse rule of construction or interpretation shall be applied against Atlas as the drafting Party of this Agreement.

19.5     This Agreement shall supersede all preceding oral and written agreements, contracts, arrangements and stipulations between the Parties concerning the matter hereof and can be revised only in a writing signed by both Parties.

19.6     Headings, as used herein, are added for the purpose of reference and convenience only, and shall in no way be referred to in construing the provisions of this Agreement.

19.7     Customer shall provide to Atlas, prior to startup of operations hereunder, copies of its most recent quarterly and annual audited financial statements, and shall furnish during the Term hereof the same statements within thirty (30) days after the end of each quarter and within ninety (90) days after the close of each fiscal year.

19.8     Except with the prior written consent and approval of Atlas or as may be required by law, Customer agrees to keep the terms of this Agreement confidential and not to publicly disclose or advertise (in the form of a press release or otherwise) that this Agreement has been entered into or any information relating to the term or performance hereunder. Customer also agrees not to use Atlas' name in any form of publicity without Atlas' prior written approval.

19.9     Customer hereby acknowledges that Atlas has and will have certain obligations and commitments in relation to the Aircraft under Atlas' air transportation contracts with the Government of the United States Department of the Air Force, as the same now exists or may hereafter be extended, renewed or replaced (a "CRAF Contract").  Within eighteen (18) hours after Atlas gives electronic notice to Customer that it is obligated to make its aircraft available under its CRAF Contract or because of a U.S. airlift emergency or U.S. national emergency as determined by the President or by the Secretary of Defense of the United States, Atlas shall discontinue operations hereunder until the cessation of such requirement or emergency without liability to Customer for the period of such discontinuance.  During the CRAF period Customer's obligations hereunder shall be suspended for the time Customer is deprived of beneficial use of Atlas aircraft.

19.10     Customer shall execute, acknowledge and deliver or shall cause to be executed, acknowledged and delivered, at Customer's expense, all such further agreements, instruments, certificates or documents and shall do and cause to be done such further acts and things, in any case, as Atlas shall reasonably request in connection with the administration of, or to carry out the purposes of, or to further assure and confirm to Atlas the rights and benefits to be provided under this Agreement.

19.11    Each signatory to this Agreement warrants and represents that such signatory has full authority and legal capacity to execute this Agreement on behalf of and intending to legally bind the Parties hereto.

19.12    This Agreement may be executed by facsimile and in counterparts, all of which taken together constitute one and the same instrument.

[signature page follows]

THIS AIRCRAFT OPERATING AGREEMENT has been executed in duplicate by the duly authorized representatives of the Parties hereto on the date first hereinabove written.

YANGTZE RIVER AIRLINES CO. LTD.

By: _____
Name: Zhang Youqiang
Title: President

ATLAS AIR INC.

By: _____
Name: MICHAEL STEEN
Title: EVP & CCO

-23-

**ANNEX A**
**to**
**AIRCRAFT OPERATING AGREEMENT**

THIS ANNEX A to that certain Aircraft Operating Agreement, dated as of May 25, 2017, by and between ATLAS AIR, INC. and YANGTZE RIVER AIRLINES CO. LTD. and by reference made a part thereof, sets forth more fully the terms and conditions agreed to therein by the Parties, as follows:

**Article 1**
**Aircraft, Term and Schedules**

1.1     Aircraft.  The Aircraft referred to in Section 1.1 of the Agreement shall be a B747-400F bearing registration number N415MC, or such other substitute aircraft from Atlas' fleet of B747-400F or B747-400BCF Aircraft as listed in the Atlas Air Operations Specifications, which will be modified depending on changes to Atlas' fleet.

1.2     The maximum cargo capacity per Flight on B747-400F Aircraft shall be 30 cargo pallets (125" x 96/88" x 118/96") (two contoured) on the main deck, nine cargo pallets (125" x 96/88" x 64") and two LD 1 containers on the lower deck, and 520 cubic feet volume for loose cargo in the lower deck bulk compartment.

1.3     Term.  The Term of the Agreement shall be for the period commencing on or about June 1, 2017 and ending on June 1, 2018 (the "Term"), subject to early termination as expressly provided herein.  The Term may be extended subject to mutual written agreement. The date of first flight shall be mutually agreed and subject to aircraft availability.

1.4     Termination.

Atlas may terminate this Agreement by notice in writing to Customer if (i) Customer defaults in the payment of any amount owed to Atlas, whether under Sections 3.1 or 3.2 of this Annex A or otherwise, and such non-payment continues unremedied for two business days after the date such payment is due hereunder or (ii) Customer defaults in the payment of any other amount owed to Atlas under this Agreement and such non-payment continues unremedied for three business days after written notice of default has been given by Atlas.

1.5        The Flight(s) and Schedule(s) referred to in Section 1.2 of the Agreement shall be as follows:

| Day of OPS | Route | DEP | ARR |
|---|---|---|---|
| 2 | ORD/CGO | 0030 | 1505 |
| 2 | CGO/PVG | 1650 | 1835 |
| 2 | PVG/ANC | 2120 | 0605 |
| 3 | ANC/ORD | 0735 | 1305 |
| 4 | ORD/CGO | 0020 | 1450 |
| 4 | CGO/PVG | 1650 | 1835 |
| 4 | PVG/ANC | 2130 | 0605 |
| 5 | ANC/ORD | 0735 | 1315 |
| 6 | ORD/CGO | 0020 | 1450 |
| 6 | CGO/PVG | 1650 | 1835 |
| 6 | PVG/ANC | 2120 | 0605 |
| 7 | ANC/ORD | 0735 | 1305 |

1.6        The area of Operations hereunder shall be global as authorized by Atlas' FAA-approved Operations Specification

## Article 2
## Block Hour Rate and Additional Services

2.1        The "Block Hour Rate" referred to in Section 2.1 of the Agreement shall be USD ███ per Block Hour flown; provided, that an incentive rate of ███ per Block Hour flown shall be charged for any Block Hours operated in excess of ███ Block Hours in any given month.

2.2        Customer agrees to compensate Atlas at the above Block Hour Rate for a monthly minimum Block Hour guarantee of ███ Block Hours per calendar month per Aircraft (the "Monthly Minimum Block Hour Guarantee"), which shall be prorated on a thirty-day basis if the relevant period is less than a full calendar month.  It is understood and agreed that any extra flights not provided for by this Annex A (charter or otherwise) requiring an additional

aircraft under this Agreement shall not be attributable toward the Monthly Minimum Block Hour Guarantee unless specifically agreed in writing by Atlas.  Customer shall have the right to cancel up to a total of ▮▮ Block Hours annually (prorated for partial years on a 360-day basis) for holidays or other commercial purposes.  Such cancellation(s) by Customer shall be notified in writing to Atlas at least ▮▮▮▮ days in advance of such Flight and shall reduce the Monthly Minimum Block Hour Guarantee for the month in which such Flight is cancelled.

2.3     The Aircraft shall be operated for Customer pursuant to a minimum Block Hour to Cycle ratio of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Should the aircraft Block Hour to Cycle ratio fall below ▮▮▮ (based on a monthly average), an excess cycle charge of USD ▮▮▮ shall apply to each excess cycle utilized.  Compliance with this paragraph will be evaluated quarterly.

2.4     In satisfaction of Section 2.4(e) and (f) of the Agreement, Customer shall pay Atlas ▮▮ per Block Hour in respect of Atlas providing (a) catering and crew meals as per Atlas' policy and (b) when Customer's rotations are 12 hours or longer, crew bed rest linens for each crew member, including one sheet, pillow, pillowcase and blanket.  Such amount shall be subject to change based on schedule changes or changes in catering expenses.

2.5     In satisfaction of Section 2.3 of the Agreement, Customer shall pay Atlas ▮▮ per day during the Term for providing pallets (PMCs only), nets and tension equipment at CGO, ORD and PVG.  If, per Customer's request, Atlas provides such provisions at any other location(s) on the Flight Schedule, Atlas will billback the actual costs for such provisions to Customer.

## Article 3
## Payment, Invoices and Notices

3.1     On the date the First flight is scheduled to operate under this Agreement, Customer shall pay Atlas for the pro-rata portion of the Monthly Minimum Block Hour Guarantee for the date of the first Flight through the remainder of the month.  Thereafter, on each the first and fifteenth of each successive calendar month during the Term, Customer shall pay Atlas, without demand, USD ▮▮▮▮ as payment for one half of the Monthly Minimum Block Hour Guarantee for the next succeeding one-half calendar month.

3.2     Within fifteen (15) days after the end of each calendar month during the Term, Atlas shall issue a reconciliation invoice for any Block Hours flown by Customer in the prior month in excess of the Monthly Minimum Block Hour Guarantee.   Payment on such reconciliation invoices shall be due within 14 days of Atlas' issuance of such invoice.

3.3     Invoices for fees and services not included in the Block Hour Rate shall be issued on or about the 15th day of each subsequent month and shall be payable within 14 days.

3.4     A late payment surcharge equal to ▮▮▮ of the unpaid balance due shall become due and payable on any late-paid invoice, with an additional ▮▮▮ of the unpaid balance accruing on the first day of each and every subsequent month thereafter during which the balance due remains unpaid.

3.5      Any and all amounts due hereunder to Atlas shall be paid in United States Dollars (USD), free of all deductions and setoffs, to:

>  JP Morgan Chase Bank
>  One Chase Manhattan Bank
>  New York, New York 10004
>  ABA #021000021
>  Atlas Air, Inc. Account #█████████

3.6      Notices:

(a)      Invoices shall be forwarded to the Customer contact at the following email addresses and fax:

>  qz_wu @yzr.com.cn
>  xi-cen@yzr.com.cn
>  xy-wei@yzr.com.cn
>  jianq.yan@yzr.com.cn
>  sp.lu@yzr.com.cn
>  m.du@yzr.com.cn
>  shengj.chen@yzr.com.cn
>  dian.li@yzr.com.cn
>  gxing.wang@yzr.com.cn
>  zm.xiong@yzr.com.cn

Fax: +86 21 6882 6325

(b)      Operational notices and messages relating to Flight(s) performed or to be performed under the Agreement shall be sent to Customer, as follows:

>  qz_wu@yzr.com.cn
>  yzrcs@yzr.com.cn
>  jiang.xuan@yzr.com.cn
>  xu_p@yzr.com.cn
>  hao_jin@yzr.com.cn
>  ysh.jiang @yzr.com.cn
>  liang-song@yzr.com.cn
>  hh_zhu@yzr.com.cn
>  r.zhu@yzr.com.cn
>  jingr.chen@yzr.com.cn
>  cjie_zhu@yzr.com.cn
>  yzrzzcz@yzr.com.cn

Fax: +86 21 6882 6281

(c)      All other notices to Customer under this Agreement shall be sent to Customer as follows:

qz_wu@yzr.com.cn
jiang.xuan@yzr.com.cn
xi-cen@yzr.com.cn
wang_bo@yzr.com.cn

Fax: +86 21 6882 6281

(d)    Invoices for the account of Atlas shall be forwarded to Atlas at the following address and fax:

Atlas Air, Inc.
Attn:  Accounts Payable Department
2000 Westchester Avenue
Purchase, NY  10577, USA
Facsimile: 914-701-8585

(e)    Operational notices and messages relating to Flight(s) performed or to be performed under the Agreement shall be sent to Atlas, as follows:

Atlas Air Operations,                  Email:  HDQOpsCont@AtlasAir.com
Atlas Air Ground Operations,      Email:  HDQGroundCoordinators@AtlasAir.com
Atlas Air Special Load Request,   Email:  Specialloads@atlasair.com
Atlas Air Performance Engineering   Email:  PE@atlasair.com
Atlas Air Dispatch,                     Email:  HDQLineDisp@AtlasAir.com
Atlas Air Permitting,                   Email:  Permitting&GovermentAffairs@AtlasAir.com

(f)    All other notices to Atlas under this Agreement shall be sent to Atlas as follows:

ATLAS AIR, INC.
President
2000 Westchester Avenue
Purchase, New York 10577
Fax:  914-701-8081

with a copy to:

ATLAS AIR, INC.
General Counsel
2000 Westchester Avenue
Purchase, New York 10577
Fax:  914-701-8333

3.7    Any notice or communication under or in connection with this Agreement shall be in English and in writing and shall be delivered personally or sent by facsimile transmission (confirmed, orally or in writing, as received by the recipient) or sent by a recognized international courier service, courier fee prepaid or certified, registered or express

-28-

mail, postage prepaid to the respective addresses or facsimile numbers given below or such other address or facsimile number as the recipient may have notified to the sender in writing.  Notices or communications shall be deemed received (a) in the case of personal delivery, recognized international courier service, certified, registered or express mail, on the date received or (b) in the case of a facsimile, upon confirmation of receipt by the addressee.  Notwithstanding the foregoing, operational notices may be sent as provided for above.

**EXHIBIT A**
**to**
**AIRCRAFT OPERATING AGREEMENT**

UNCONDITIONAL GUARANTY AGREEMENT

THIS UNCONDITIONAL GUARANTY AGREEMENT (the "Guaranty"), dated as of this 25th day of May 2017, is entered into by and among HNA Modern Logistics Group, a corporation organized under the laws of China (the "Guarantor"), Yangtze River Airlines Co. Ltd., a corporation organized under the laws of China ("Yangtze River") and Atlas Air, Inc. ("Atlas"). The Guarantor, Atlas and Yangtze River collectively referred to herein as the "Parties"

WITNESSETH:

WHEREAS, Atlas and Yangtze River have entered into the Aircraft Operating Agreement dated as of the date hereof (the "Aircraft Operating Agreement") for certain cargo lift with Atlas being the "Operator" of the aircraft and Yangtze River being the "Customer";

WHEREAS, the Guarantor is the parent company of Yangtze River; and

WHEREAS, the Guarantor, as an inducement to Atlas to enter into the Aircraft Operating Agreement, has agreed to unconditionally guarantee all payment, performance and other related undertakings responsibilities of Yangtze River under the Aircraft Operating Agreement as if the Aircraft Operating Agreement were between Atlas and Guarantor directly.

NOW, THEREFORE, in consideration of the foregoing premises, and to induce the Parties hereto to enter into this Guaranty and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agrees as follows:

1.      Definitions. All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Aircraft Operating Agreement.

2.      Guaranty. For value received and to induce Atlas to enter into the Aircraft Operating Agreement, Guarantor, as a primary obligor and not merely as a surety, without set-off, abatement, deferment or deduction, does hereby absolutely, unconditionally and irrevocably, guarantee to Atlas the due and punctual payment, observance and performance of all present and future obligations of Yangtze River under the Aircraft Operating Agreement (the "Obligations") whether voluntary or involuntary and however arising, whether direct or acquired by assignment or succession, absolute or contingent, liquidated or unliquidated, whether such obligations are from time to time reduced or extinguished and thereafter increased or incurred by amendment or otherwise, whether the Guarantor may be liable individually, or jointly with others, and whether such obligations maybe or hereinafter become unenforceable. Accordingly, Guarantor shall forthwith without demand of any kind pay, perform and observe all of such Obligations, to and for the benefit of Atlas strictly in accordance with the terms of the Aircraft Operating Agreement

as if Guarantor were the Customer.  Guarantor further agrees to pay any and all reasonable out-of-pocket costs and expenses (including reasonable fees and disbursements of legal counsel and other professional advisors) that may be paid or incurred by Atlas in collecting any Obligations or in preserving or enforcing any rights under this Guaranty or under the Obligations.

3.     _Absolute and Continuing Guaranty._ The Obligations of Guarantor under this Guaranty shall be absolute, continuing, unconditional and irrevocable and this Guaranty shall remain in full force and effect until such time as all of the Obligations are finally paid, performed and observed in full. The Obligations of Guarantor set forth herein constitute full recourse obligations of Guarantor enforceable against it to the full extent of all its assets and properties.

4.     _Strict Observance_. To the maximum extent permitted by applicable Law, the Obligations of Guarantor under this Guaranty shall not in any manner be affected by: (a) any termination, amendment or modification of, or deletion from, or addition or supplement to, or other change in the Aircraft Operating Agreement including an increase in the Block Hour Rate, Minimum Monthly Guarantee Amount or extension of the Term, or any other instrument or agreement applicable to any of the parties to such agreements (except that the Obligations shall include any new Obligations which are incurred by Yangtze River as a result of any such amendment or modification to the Aircraft Operating Agreement); (b) any exercise or nonexercise of any right, remedy, power or privilege under or in respect of any Aircraft Operating Agreement; (c) any extension of time for payment of or settlement, compromise or subordination of, Rent or any other Obligation; (d) any failure, omission or delay on the part of Atlas to enforce, assert or exercise any right, power or remedy conferred on it in this Guaranty or the Aircraft Operating Agreement; (e) any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, conservatorship, custodianship, liquidation, marshaling of assets and liabilities or similar proceedings with respect the Guarantor or any action taken by any trustee or receiver or by any court in any such proceeding; (f) any invalidity, illegality or unenforceability, in whole or in part, of the Aircraft Operating Agreement; (g) any release or discharge, by operation of law, of Guarantor from the performance or observance of any Obligation, covenant or agreement contained in this Guaranty, or any release, discharge or cancellation of the Obligations, other than payment or performance in full of the Obligations; (h) the effect of any foreign or domestic laws, rules, regulations or actions of a court or governmental body or entity; (i) any damages to or loss or destructive of , or any interruption or cessation in the equipment or business of Atlas for any reason whatsoever (including without limitation any governmental or military, authority, or any Act of God of the public enemy) regardless of the duration thereof, whether or not arising with or without fault on the part of Guarantor or any other person or (j) any other condition, event or circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a surety or guarantor or otherwise, or which might otherwise limit recourse against Guarantor, it being agreed that the Obligations of Guarantor hereunder shall not be discharged except by payment and performance in full as herein provided. No failure to make demand or delay in making demand on Guarantor for satisfaction of the obligations of Guarantor hereunder shall prejudice the right of Atlas to enforce the obligations of Guarantor hereunder.

5.     _Waivers of Notice, Defenses of Guarantor._ To the maximum extent permitted by applicable law, Guarantor hereby waives diligence, presentment, demand, protest, defenses or

notice of any kind whatsoever with respect to this Guaranty or the Obligations, including: (a) notice of acceptance of this Guaranty, notice of nonpayment or nonperformance of any of the Obligations and (b) all notices required by statute, rule of law or otherwise now or hereafter in effect to preserve any rights against Guarantor, and (w) any requirement to exhaust any remedies, (x) any requirement of promptness in commencing suit against any person who may be or become liable thereon, and (y) any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge, release or defense of Guarantor or any surety or which might otherwise limit recourse against Guarantor.  Each of the Obligations shall be deemed conclusively to have been created, contracted or incurred in reliance upon this Guaranty.

6.    <u>No Waiver</u>. No failure on the part of any of Atlas to exercise, and no delay in exercising, any right or power under this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power preclude any other or further exercise thereof or the exercise of any other right or power, or of any remedy, of Atlas under this Guaranty or the Aircraft Operating Agreement or applicable law.

7.    <u>Guaranty of Performance</u>. This Guaranty is a guaranty of payment and performance and not of collection and Guarantor waives any right to require that any action against Yangtze River be taken or exhausted prior to action being taken against Guarantor. Guarantor shall pay Atlas on demand all reasonable attorneys' fees and other reasonable expenses incurred by Atlas in exercising its rights and remedies provided hereunder, together with interest on such sums at the highest rate permitted by law.

8.    <u>Representations, Warranties and Covenants</u>. Guarantor represents warrants and covenants to and for the benefit of Atlas that:

(a) Guarantor is a company duly organized under the laws of China and has the full power and authority to carry on its business as presently conducted and to enter into and perform its obligations under this Guaranty and the Aircraft Operating Agreement.

(b) The execution, delivery and performance by the undersigned of the Guaranty have been duly authorized on the part of the Guarantor and will not violate any provision of any governing law. This Guaranty is the legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms.

(c) Guarantor shall perform its obligations under this Agreement and conduct all related activities in accordance with the applicable laws of each governmental authority exercising jurisdiction of the flights performed under the Aircraft Operating Agreement and shall neither undertake, nor cause, nor permit to be undertaken, any activity which either is illegal under any applicable law or would have the effect of causing Atlas to be in violation of any applicable law, including without limitation the U.S. Foreign Corrupt Practices Act or the U.K. Bribery Act.  As required under the U.S. Foreign Corrupt Practices Act, Guarantor shall not, directly or indirectly, give, offer, promote, authorize or allow to be given, offered or promised, money, gifts or anything of value to a

Government Official (defined below), or to any other person(s) or party(ies), while knowing or having reason to know that such thing of value is to be given, offered or promised to a Government Official, in order to (i) improperly influence any official act or decision of such Government Official, or (ii) improperly induce such Government Official to use his influence to affect or influence any act or decision of any governmental authority (including the government of Guarantor or any governmental entity related to the flights operated under the Aircraft Operating Agreement or, any department, agency or instrumentality thereof, or any entity owned in whole or in part or controlled by such government), for the purpose of assisting Atlas in obtaining or retaining business, in directing business to any person, or in securing any improper advantage.  For the purpose of this section, the term "Government Official" means any official, employee or representative of a national, state, regional or local governmental body, department, agency or any instrumentality thereof (including without limitation the government of Guarantor or any governmental entity related to the Flights operated hereunder, or any subdivision or branch thereof), any entity owned wholly or in part or controlled by any such entity (including without limitation entities engaged in commercial activity), any political party or political party official, any candidate for political office, and any official, employee or representative of a public international organization (such as the World Bank, International Monetary Fund, or United Nations).

(d) Neither the execution and delivery nor the performance of this Agreement or Yangtze River's execution of the Aircraft Operating Agreement violates any agreement Guarantor has with, or legal obligation Guarantor has to any third party.

9.   <u>Financial Statements</u>.  Guarantor and Yangtze River shall provide to Atlas, prior to startup of operations under the Aircraft Operating Agreement, copies of their most recent annual audited financial statements, and furnish during the Term hereof the same statements within ninety (90) days after the close of each fiscal year.  Notwithstanding the foregoing, if annual audited financial statements are not available within ninety (90) days of fiscal year end, draft statements will be provided with the final audited financial statements provided as soon as they are available.

10.   <u>Additional Aircraft Operating Agreement Termination Rights.</u>

(a)   Atlas may terminate the Aircraft Operating Agreement by notice in writing to Yangtze River with immediate effect if (i) Guarantor commits any breach of the Guaranty or (ii) if Guarantor is declared bankrupt, or becomes insolvent, files for Chapter 11, or files any other petition for bankruptcy, or if the whole or a substantial part of its property is seized before judgment or under an execution, or if a bankruptcy or insolvency proceeding is commenced against it in any jurisdiction.  Any termination of the Aircraft Operating Agreement by Atlas under this paragraph shall be without prejudice to Atlas' other rights under the Aircraft Operating Agreement and at law or in equity.

11.    <u>Severability of Provisions</u>. Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.    <u>Amendments</u>. This Guaranty and any provision hereof may be terminated, waived, amended, modified or supplemented only by an agreement or instrument in writing, specifying the provision (or, if applicable, the whole of this Guaranty) intended to be terminated, waived, amended, modified or supplemented, and executed by Guarantor and Atlas.

13.    <u>Government Authorizations</u>. Guarantor will obtain from time to time all permits, licenses, approvals and authorizations of, and will file all registrations and declarations with, all governmental authorities, bureaus and agencies and will pay all stamp duties required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty (including, payments hereunder, in the lawful currency of the United States of America, of the Obligations) and will take all actions necessary to maintain each such permit, license approval authorization, registration or declaration in full force and effect.

14.    <u>Headings</u>. Paragraph headings used herein are for convenience only and shall not be used or construed to define, interpret, expand or limit any provision hereof.

15.    <u>Entire Agreement</u>. This Guaranty constitutes, on and as of the date hereof, the entire agreement of the Parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous understandings or agreements, whether written or oral, between the Parties with respect to the subject matter hereof.

16.    <u>Further Assurances</u>. Guarantor shall execute and deliver all such instruments and take all such actions as Atlas may from time to time reasonably request in order to effectuate and perfect fully the purposes of this Guaranty, and any or all of any Atlas's rights, titles, interest, benefits or remedies hereunder.

17.    <u>Successors and Assigns</u>. This Guaranty shall be binding upon the successors of the Guarantor.  The Obligations under this Guaranty may not be assigned, transferred, pledged, hypothecated or encumbered without the written consent of Atlas.

18.    <u>Incorporation by Reference</u>.  This Guaranty is hereby agreed by the Parties hereto to be incorporated by reference into the Aircraft Operating Agreement referred to herein.

19.    <u>Notices</u>. Every notice, request, demand or other communication under this Guaranty shall be given and effective as set forth in the Aircraft Operating Agreement to the addresses below:

Atlas Air, Inc.
2000 Westchester Avenue

Purchase, NY 10577
Attention: General Counsel

Yangtze River Airlines Co. Ltd.
12F Building A, Yunding International Plaza, No. 800
Chengshan Road
Pudong, Shanghai
200120, P.R. China
Attention: Wu Qiongzhu

HNA Modern Logistics Group
F/35, SG City Square, Fengcheng 7th Road
Weiyang District, Xi'an City, Shaanxi Province
710018, P.R. China
Attention: Legal Department

or to such other address or facsimile number as is notified by any Party in writing to the other Parties under this Guaranty in accordance with the notice provisions of this Guaranty.

20.    Governing Law.  This Guaranty and the interpretation and performance hereof shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws other than Section 5-1401 and 5-1402 of the New York General Obligations Law.

21.    Jurisdiction.   Each Party hereby irrevocably agrees, accepts and submits to, for itself and in respect of any of its property, generally and unconditionally, the exclusive jurisdiction of the courts of the State of New York in the City and County of New York and of the United States for the Southern District of New York, in connection with any legal action, suit or proceeding with respect to any matter relating to or arising out of or in connection with this Guaranty or any other operative agreement and fully waives any objection to the venue of such courts; provided that Guarantor notwithstanding the foregoing agrees that any legal action or proceeding arising out of or in connection with this Guaranty may be brought by Atlas in any jurisdiction where Guarantor or any of its assets may be found.  To the fullest extent permitted by applicable law, each Party hereby waives, and agrees not to assert, by claim of motion, as a defense, or otherwise, in any such suit action or proceeding any claim that it is not personally subject to the jurisdiction of the above named New York courts, that the suit, action or proceeding is brought in an inconvenient forum, or that the venue of the suit, action or proceeding is improper. Guarantor agrees that a judgment in any action or proceeding arising out of or relating to this Guaranty may be enforced in any other jurisdiction by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of the indebtedness or liability therein described, or in any other manner provided by applicable law.

22.    Process Agent.  Guarantor hereby irrevocably designates, appoints and empowers Yangtze River Express Airlines Co. Ltd. with an address of 10700 Seymour Avenue, Franklin

Park, IL, 60176 as its authorized agent for service of process in any suit or proceeding with respect to this Guaranty.

23.    <u>Waiver of Jury Trial</u>.  Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Guaranty.

24.    <u>Waiver of Immunity</u>.  To the extent that Guarantor may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), Guarantor hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the full extent permitted by the law of such jurisdiction.  Neither Guarantor nor any of its property, assets or revenues shall enjoy any right of immunity, sovereign or otherwise, or exemption under applicable laws on any grounds from suit, seizure, execution, attachment or other legal process in respect of its obligations hereunder, and the execution, delivery and performance of such obligations shall constitute its private and commercial acts.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this UNCONDITIONAL
GUARANTY AGREEMENT to be duly executed as of the day and year first above written.

ATLAS AIR, INC.

Name: MICHAEL STEEN

Title: EVP & CCO

YANGTZE RIVER AIRLINES CO. LTD.

By: _____
Name: Zhang Youqiang
  Title: President

HNA MODERN LOGISTICS GROUP

By: _____
Name: Zhang Weiliang
Title:   President

AMENDMENT NO. 1 TO AIRCRAFT OPERATING AGREEMENT

This Amendment No. 1 ("Amendment No. 1") to Aircraft Operating Agreement is made and entered into as of June 21, 2017 by and between Atlas Air, Inc., a Delaware corporation having its principal office at 2000 Westchester Avenue, Purchase New York 10577, USA ("Atlas"), and **Suparna Airlines Co. Ltd.,** having its principal place of business at 12F Building A, Yunding International Plaza, No. 800, Chengshan Road, Pudong, Shanghai 200120, P.R. China ("Customer"). Atlas and Customer are referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, Atlas and Customer are parties to that certain Aircraft Operating Agreement dated May 25, 2017 (the "Agreement");

WHEREAS, the company name of Customer changed from "Yangtze River Airlines Co. Ltd." to "Suparna Airlines Company Limited" effective as of _June 26th __, 2017; and

WHEREAS, the Parties desire to amend the Agreement to reflect the name change of Customer.

NOW, THEREFORE, in consideration of the foregoing, the Parties agree as follows:

1. The term "Yangtze River Airlines Co. Ltd." as it appears in each instance in the Agreement shall be replaced with the term "Suparna Airlines Company Limited".

2. This amendment No. 1 accomplishes a change of company name only and all duties, rights and obligations of the Parties under the Agreement are unaffected by this change. For the avoidance of doubt, the Parties remain the same and only the company name of Customer has changed.

3. Except as expressly modified herein, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

4. The Parties agree to keep the terms and conditions of this Amendment No. 1 strictly confidential and will not, without the prior written consent of the other Party, disclose the terms and conditions of this Amendment No. 1 to any person or entity except as may be required by law.

5. This Amendment No. 1 may be executed by facsimile, pdf or other electronic signature method and in counterparts, all of which taken together constitute one and the same instrument.

6. This Amendment No. 1 and the interpretation and performance hereof shall be governed by the laws of the State of New York, without giving effect to principles of

conflicts of laws other than Section 5-1401 and 5-1402 of the New York General
Obligations Law.

*[signature page follows]*

This Amendment No. 1 has been executed in duplicate by the duly authorized representatives of the Parties hereto on the date first hereinabove written.

ATLAS AIR, INC.                          SUPARNA AIRLINES CO. LTD.

By: _____             By: _____Zhang Youqiang_____

Name: _____             Name: _____

Title:        Michael T. Steen          Title: _____President_____
         Executive Vice President
        & Chief Commercial Officer

AMENDMENT NO. 2 TO AIRCRAFT OPERATING AGREEMENT

This Amendment No. 2 ("Amendment No. 2") to Aircraft Operating Agreement is made and entered into as of June 27, 2017 by and between Atlas Air, Inc., a Delaware corporation having its principal office at 2000 Westchester Avenue, Purchase New York 10577, USA ("Atlas"), and Suparna Airlines Co. Ltd., having its principal place of business at 12F Building A, Yunding International Plaza, No. 800, Chengshan Road, Pudong, Shanghai 200120, P.R. China ("Customer"). Atlas and Customer are referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, Atlas and Customer are parties to that certain Aircraft Operating Agreement dated May 25, 2017, as amended (the "Agreement") and desire to amend the Agreement as set forth herein;

NOW, THEREFORE, it is agreed:

1. Article 2.4. of the Aircraft Operating Agreement is hereby amended by deleting section (a).

2. Article 2 of the Annex A of the Agreement is hereby amended by adding a new section 2.6 below:

2.6    Fuel.  Notwithstanding Section 2.4(a) of the Agreement, Atlas agrees to procure fuel (including all in plane fuel costs such as fuel storage, and transportation, if applicable,) and into plane fueling services for Customer for all Flights under this Agreement at Customer's cost, subject to following conditions:

(a)    A one-time cash deposit of          will be paid by Customer and maintained by Atlas as security for Customer's obligations with respect to fuel. The deposit may be comingled with Atlas' general funds. In the event Atlas utilizes the deposit against due and unpaid amounts, Atlas shall provide notice to the Customer and the Customer shall pay Atlas additional funds such that the deposit remains at          The deposit will be applied to final payment obligations or otherwise refunded at the end of the Agreement upon the condition that no outstanding amounts are due.

(b)    A prepaid estimate of all fuel costs must be paid in advance. Atlas will issue invoices according to the following example. For fuel purchases to be made for operations occurring during the week of July 17th, Atlas will issue an estimated fuel invoice on our before Friday, July 7th. Such invoice must be paid on or before Wednesday, July 12th.

(c)    Atlas will provide Customer with a quarterly reconciliation invoice showing fuel consumed and charging Customer for any amounts above the estimate or crediting Customer for any overpayments. Atlas shall complete each quarterly reconciliation within forty-five (45) days of the end of the applicable contract quarter.

(d)    An administrative fee of          per gallon shall be payable by Customer on all fuel purchases made on Customer's behalf by Atlas.

-1-

    (e) Upon 30 day's advance written notice to Customer, Atlas may elect to stop providing fuel to Customer with Customer resuming its obligations to purchase fuel directly under Section 2.4(a) of the Agreement.

    (f) For clarity, Customer shall be responsible for paying for any costs and expenses related to fuel or fuel services procured for Customer including vendor costs and any applicable taxes.

  3. Article 2 of the Annex A of the Agreement is hereby amended by adding a new section 2.7 below:

    "2.7. Logistics Addendum. Set forth in the logistics addendum attached as Annex B to this Agreement (the "Logistics Addendum") are certain agreed rates Atlas will charge for providing services that are Customer's responsibility under Section 2.4 or otherwise under the Agreement. The Parties agree that the fees in the Logistics Addendum represent Atlas' costs as of the date of this Agreement and the Parties will review such costs on a quarterly basis and in the event actual costs vary by more than 5% on any line item, the Parties will review within 14 days and adjust the costs on a going forward basis (with no revision to past charges). In the event that the Parties desire to add or remove services to this Logistics Addendum, the Parties may update this Logistics Addendum by executing a new addendum without the need for an Amendment to the Agreement. Atlas shall have the right to cease providing any services set forth in the Logistics Addendum that could otherwise be provided by the Customer upon thirty days written notice to the Customer.

  4. The Agreement is amended by adding the Annex B attached to this Amendment No. 2 as Annex B to the Agreement.

  5. Except as expressly modified herein, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

  6. Section 15 (Governing Law), Section 19.8 (Confidentiality), Section 19.11 (Authorized Signatory) and 19.12 (Electronic Signatures) of the Agreement are incorporated by reference into this Amendment No. 2.

*[signature page follows]*

-2-

IN WITNESS WHEREOF, this Amendment No. 2 has been executed in duplicate by the duly authorized representatives of the Parties hereto on the date first hereinabove written.

ATLAS AIR, INC.                          SUPARNA AIRLINES CO. LTD.

By: _____              By: _____
Name:                                    Name: Zhang Youqiang
Title:    Michael T. Steen               Title:   President
          Executive Vice President
          & Chief Commercial Officer

-3-

**ANNEX B**
**to**
**AIRCRAFT OPERATING AGREEMENT**



Yangtze River Addendum - Effective July 1 2017